BEFORE THE SECOND DIVISION, MARCH 16, 1956

**No. 59768.**—B–1 Beverage Co. *v.* United States, petition 7156–R (St. Louis).

FORD, Judge: This petition was filed under the provisions of section 489 of the Tariff Act of 1930, seeking remission of additional duties assessed by reason of undervaluation on entry of certain imported merchandise at the port of St. Louis, Mo.

The merchandise consisted of sugar candy purchased in and exported from Cuba. It was entered at $10.14 per 100 pounds and was appraised at $18 per 100 pounds. The entry was made by a customs brokerage firm, the owner of such firm testifying for the petitioner herein at the trial. He testified that he made the entry at $10.14 because the invoice sent him by the petitioner herein showed that price; that the appraiser or examiner never questioned him as to the value of the candy, and never suggested or requested that the entry be amended; and that the first time he realized that the entered value was being questioned was when he received a notice of advance in value. The witness further testified that, in making the entry as he did, he had no intention to defraud the revenue of the United States or to conceal or misrepresent the facts of the case or to deceive the appraiser as to the value of the merchandise.

On cross-examination, the witness testified that, when he made the entry, he asked the petitioner for all the invoices connected with the shipment and that "He brought them down to the office," but that petitioner did not bring an "invoice showing the sale price of 18 cents"; that he did not make any inquiry in Cuba as to the value of this candy; that Customs Agent Malone contacted him regarding this importation; and that he delivered to him his entire file on the transaction.

On re-cross-examination, the witness was asked "As a Customs broker, didn't you know when the Custom Agent is interviewing you regarding a shipment that there is something wrong with the value of the shipment or something wrong with the invoicing of the shipment?" to which the witness replied: "There usually is"; that his suspicion was aroused when Customs Agent Malone

visited him, but, despite that, he did nothing to find out what the cause of the trouble was or what the discrepancy might be.

Oliver C. Thener testified that he was president of the B–1 Beverage Co., located in St. Louis; that, in September 1946, he, as vice president in charge of production, accompanied Mr. Meyer, then president of the company, on a trip to Cuba, and, knowing of the sugar shortage, "we figured we could, while we were in Cuba, we could come up with some sugar candy and send it into this country and use it for making syrups and convert it; convert it into syrups"; that, on their trips to the different manufacturers in Cuba, investigating the market conditions and the market value of sugar, candy balls were 8 cents up to 11 or 12 cents; "it is $10.14 for the sugar a hundred and with the freight and with the cost of insurance and freight, it would amount to $11.25 per 100."

The witness further testified that they had not been able to locate any sugar candy for sale until they met a Mr. Hagerman, who knew them from St. Louis, "He said I got plenty of candy here through this group; I'll sell you some candy if you have the permits and we told him we had the permits to buy candy so he had the candy, so we went out"; that Hagerman took them to the Cuban Candies Manufacturing Corp., where they met a Dr. Meneses and one or two other men through whom they finally purchased the involved candy at a price of 10.14 cents per pound, f. o. b. Havana, which was the equivalent of 11.25 cents per pound, c. i. f. West Palm Beach; that there were to be additional payments, "I'd say brokerage fees and for availability," meaning for helping to get the candy; that, in order to get the candy landed in the United States, the total amount of money paid out by his company was $12,287.42, and there being 50,000 pounds of candy in this importation, at 19.1 cents per pound, would make a total of $9,550; that, on or about November 29, 1946, his company received both a consular and a commercial invoice showing a price of $10.14 per 100 pounds f. o. b. Havana, which invoice was forwarded to the broker who made entry; that, at the same time, he received another invoice from Dr. Meneses for $19.10 per 100 pounds c. i. f. West Palm Beach, which figures $18 f. o. b. Havana, but that he did not turn this invoice over to his broker because "Mr. Meyer discussed with me that was for commissions; the difference was for commissions or brokerage fees by Hagerman and his partner. There was no need for turning that over. It was for brokerage."

Q. Will you tell the Court why you believe that was the correct value of the merchandise?

\*      \*      \*      \*      \*      \*      \*

THE WITNESS: Because we, one thing was that the candy was sold for that and candy was selling for that in the States here and that was our deal with Mr. Meyer—Mr. Meyer's deal with Mr. Hagerman, when we were at the candy factory. We knew that we had to pay Hagerman a commission because Hagerman wasn't down in Cuba for nothing.

JUDGE FORD: Right there, Mr. Witness, do you consider a commission of 90 per cent a fair commission?

THE WITNESS: I think it figures around 7¾ cents per pound; that's what it figures.

JUDGE FORD: I thought the invoice you received from Mr. Meneses showed 19 and one-tenth cents per 100 or $19.10 per 100?

THE WITNESS: Yes.

JUDGE FORD: And, you paid $10.14?

THE WITNESS: Yes.

JUDGE FORD: Are you telling this Court that you paid the difference in commissions?

THE WITNESS: That is what it was supposed to be.

JUDGE FORD: Are you telling the Court that?

THE WITNESS: Yes, that's right.

The witness also testified that when Customs Agent Malone visited his office, he turned over to him the complete file on this importation. There was also testimony regarding an appeal for a reappraisement having been filed and abandoned, because the Cuban Candies Manufacturing Corp. had gone out of business, and it was, therefore, impossible to secure any evidence to support the appeal. The witness also testified that the petitioner sustained a loss of $4,706.85 on this transaction.

On cross-examination, the witness was shown a document, called an agreement between Mr. Meyer and Mr. Lewis B. Hagerman, and was asked whether or not this was an agreement which he and Mr. Meyer had entered into with Mr. Hagerman, to which he replied: "I never seen this at all until I have seen it in the file and it was brought to my attention."

X Q. Will you show to the Court, Mr. Thener, where in Respondent's Exhibit 1, there is any mention made about any commission to be paid to Mr. Hagerman or Mr. Meneses in the purchase of this candy?—A. No, there is no mention in this letter here.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

X Q. And, did you at any time prior to the date of the appraisement ever give your file showing the purchase price at 18 cents of this particular candy to Mr. Hanebrink or anybody connected with the customs brokerage firm?—A. Not to my knowledge.

The witness also testified that the 18- or 19-cent-per-pound price shown on the invoice included the price of the candy and also the commission or brokerage fee, or whatever you want to call it, which was to be paid to Dr. Meneses and Mr. Hagerman.

Upon this record, counsel for petitioner contends, in its brief filed herein, that it is obvious that the appraiser appraised this merchandise at a different value from that upon which the petitioner entered such merchandise on the same information, which was obtained by the appraiser from the candid and full disclosure by the petitioner herein prior to the time of the appraisement of the merchandise at bar.

In connection with this contention, it must be remembered that petitioner did not at any time make a candid and full disclosure of all the information in its possession to the brokerage firm making the entry, or to any one else, so far as this record discloses, until Customs Agent Malone came and requested or demanded petitioner's file regarding this transaction. The record makes it quite clear that petitioner knew of the invoice in its possession showing a price of $18 per 100 pounds f. o. b. Havana, Cuba, for this candy, which invoice, but for the visit of Customs Agent Malone, might have remained in the file in possession of petitioner herein. This can scarcely be denominated a "candid and full disclosure" to the customs officials by petitioner.

As supporting the above contention, counsel for petitioner cites the case of *Crown Publishers* v. *United States*, 25 Cust. Ct. 159, C. D. 1278, as being apropos of the present petition. In that case, the court said:

> The appraiser's advance in value was actually the result of an honest difference of opinion between petitioner and the customs officials. The situation is not unlike that found to exist in *Syndicate Trading Co.* v. *United States*, 13 Ct. Cust. Appls. 409, T. D. 41339. There, as here, the importer consulted with appraising officials prior to entry. The former contended that certain discount was not part of dutiable value and, therefore, excluded it on entry, while the latter insisted upon including the item and appraised the merchandise accordingly. In granting the petition, the Court of Customs Appeals said that "if the importer exercises what is, under the circumstances of the case, absolute good faith in making his

entry, and fully and candidly discloses all the material facts bearing upon the value of the merchandise, he is entitled to a remission of additional duties."

We agree with the above quotation from the *Syndicate Trading Co.* case, *supra,* but, when petitioner herein has in its possession an invoice showing much higher prices for the involved merchandise and fails or refuses to make known that information to any one until visited by a customs agent, who requests the file containing such invoice, how can it be said that petitioner has made a full and candid disclosure of all the material facts in its possession bearing upon the value of the merchandise? In the present case, the petitioner did not consult with the appraising officials prior to entry, as was done in the *Syndicate Trading Co.* case, *supra,* but elected to consider the difference between the two invoices, amounting to approximately 90 per centum, as a commission or brokerage fee. Such action on the part of petitioner herein, we are not able to construe as a full and candid disclosure to customs officials of all the information in the possession of petitioner prior to the time of entry.

Counsel for petitioner stresses the importance of the phrase "honest difference of opinion" between petitioner and the customs officials. Until these two parties have met and discussed the proper value at which the involved candy should be entered for customs purposes, it is difficult to understand how there could be an "honest difference of opinion" between them.

As supporting the position of respondent, counsel cites the case of *United States* v. *W. J. Westerfield,* 40 C. C. P. A. (Customs) 115, C. A. D. 507. In that case, there was an undisclosed invoice, showing a higher price, in the possession of the importer, and there was likewise a penalty assessed against the importer for false invoicing. The same two facts are present in the instant case. In reversing this court, the Court of Customs and Patent Appeals said in part:

Again, since the value, as stated on the first invoice (# 196) was an essential fundamental to appraisement, and since Mr. Westerfield had that in his possession, it can not be held to have been established that "he made to the collector in making his entry a full and candid disclosure of all the material facts in his possession bearing upon the value of the merchandise."

In the case of *United States* v. *Pacific Coast Feather Company,* 40 C. C. P. A. (Customs) 141, C. A. D. 510, the merchandise was entered at a lower price than the purchase price. Neither the consular invoice nor the commercial invoice, setting forth the correct purchase price, was sent to the broker. In that case, the Court of Customs and Patent Appeals said:

The only issue here is whether or not appellee produced satisfactory evidence that the entry made at less than its true value was without intention to defraud the revenue of the United States or to "conceal or misrepresent the facts of the case or to deceive the appraiser as to the value of the merchandise."

It is obvious that prior to the time of entry the importer knew the foreign price list of the shipper and the cablegrams hereinbefore noted with respect to the merchandise were in its possession. It is clear that it must have had the consular invoice which was certified in Shanghai March 9, 1949, showing the actual purchase price for the shipment and certainly it knew the true purchase price of the involved merchandise.

In our opinion it is clear from the record that no satisfactory evidence has been produced that there was no intention to conceal or misrepresent the facts of the case or to deceive the appraiser as to the value of the merchandise.

In this case, neither the petitioner nor the broker did anything to ascertain the true value of the merchandise herein, even after a visit by Customs Agent Malone. Therefore, upon a full consideration of this record, in the light of the authorities cited and quoted herein, we hold that the petitioner has failed to produce satisfactory evidence to establish that the entry of the involved merchandise at a less value than that returned upon final appraisement was made without intention to

defraud the revenue of the United States or to conceal or misrepresent the facts of the case or to deceive the appraiser as to the value of the merchandise. The petition is, therefore, denied. Judgment will be rendered accordingly.